Filed 8/28/23  P. v. Vang CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C095739 |
| Plaintiff and Respondent, | (Super. Ct. No. 17FE010723) |
| v. | |
| JIMMY YOUNG VANG, | |
| Defendant and Appellant. | |

Defendant Jimmy Young Vang appeals from his conviction of willful, deliberate, and premeditated attempted murder of a peace officer and other associated crimes.  He contends insufficient evidence supports his attempted murder conviction.  He also argues that we should remand the matter for the trial court to exercise its discretion to strike or dismiss a firearm enhancement, and that the trial court erred by imposing restitution fines without determining defendant's ability to pay.

We note that in his opening brief, defendant also argued that we should remand the matter for the trial court to reconsider sentencing under Penal Code section 654 as

1

recently amended.  (Undesignated section references are to the Penal Code.)  Prior to filing his reply brief, however, defendant informed the court that he has withdrawn his argument under section 654.  We need will not address it.

We affirm the judgment.

## FACTS AND HISTORY OF THE PROCEEDINGS

A.      <u>Raelyn</u> <u>Bergsten</u> <u>Testimony</u>

Raelyn Bergsten testified under a grant of use immunity.  On June 8, 2017, Bergsten and defendant were staying at a motel on Freeport Boulevard in Sacramento.  They had been romantically involved for over a month.  Around 2:30 a.m. that morning, Bergsten and defendant drove to a Walgreens store.  They traveled in a 2004 Lincoln sedan defendant had acquired a few weeks earlier.  Defendant made a purchase, and the two left Walgreens around 2:43 a.m.  Bergsten drove the Lincoln and defendant rode in the passenger seat.

Minutes later, while driving down Fruitridge, Bergsten noticed an officer in a parked police car.  Defendant did not indicate he had seen the officer, and Bergsten could not remember if defendant waved at the officer.  Bergsten was nervous, since she did not have a driver's license.  She attempted to slow down before making a turn, but she believed she did not stop long enough.  The officer flashed his lights and chirped his siren behind her.

The Lincoln did not have brakes.  Bergsten was able to slow it down, but the car kept rolling.  Defendant told Bergsten to pull over, which she did.  Defendant grabbed a handgun from the passenger side door and, without saying anything, got out of the car, covered his face, and started shooting.  It appeared to Bergsten that defendant shot four or five times in the air and toward the back of the car where the officer was.  Then he got into the car and Bergsten took off.

2

After Bergsten drove a short distance, defendant told her to stop. She pumped the brakes but could not get the car to stop completely. Defendant got out of the car and took off running. He left the gun on the car's floorboard. Bergsten "hit the gas and didn't look back."

Police gave pursuit. The chase ultimately ended in Yolo County after Bergsten ran over a spike strip, lost control of the car, and crashed it off the freeway into an orchard. She jumped out of the car, threw the gun away, and ran. She jumped into a body of water by a levee and swam toward a bridge. Daylight was breaking, and she saw workers nearby. One of them helped her out of the water, and she told him she had been raped, which was not true. An ambulance eventually took her to a hospital.

Bergsten initially told detectives her fabricated story about having been raped. In subsequent interviews, however, she identified defendant as the shooter and explained her involvement in the shooting and the chase.

B.    Law Enforcement Officers' Testimony

On June 8, 2017, Deputy Dallas Calmes of the Sacramento County Sheriff's Department was on patrol in South Sacramento. Around 2:50 a.m., while Calmes was driving north, he saw a pearl white Lincoln sedan driving east on Fruitridge Road. The male passenger in the sedan, defendant, had his arm on the window, and as the sedan passed in front of Calmes, defendant raised his arm up. The gesture was not offensive, but it drew Calmes's attention to the vehicle.

Deputy Calmes followed the vehicle and determined its registration was expired. He noticed on his computer system that another patrol car was in the vicinity, and he announced on his radio that he was conducting a vehicle stop at Stockton Boulevard and Fruitridge Road. As the sedan turned south onto Stockton Boulevard, Calmes turned on his overhead emergency lights to make a vehicle stop. He also used his siren two times

3

to get the driver's attention.  These actions activated the dash camera in Calmes's patrol car.

Deputy Sheriff Eric Door and his partner, Deputy Sheriff Cameron Seitz, were patrolling in the area.  Hearing Deputy Calmes's radio announcement, Door drove down Stockton Boulevard to assist and to cover Calmes.  Door saw a white sedan and Calmes's marked police car with his lights on turn onto Stockton Boulevard.  Door pulled his vehicle up behind Calmes's patrol car.

The Lincoln sedan sped up a bit, but then it stopped on the shoulder.  Calmes stopped his car behind the Lincoln's driver's side, and Door stopped his car between 10 and 20 yards behind Calmes's car and 20 to 25 yards behind the Lincoln's passenger door.  As the Lincoln was coming to a rest, its passenger door opened.  Deputy Calmes suspected the passenger was going to run.  But defendant got out of the vehicle and immediately began firing a handgun at Calmes's vehicle.  Calmes ducked down as low as he could to his left behind the steering wheel, and he drew his weapon and returned two shots.  Defendant got back into the passenger seat, and the sedan sped off.  Then it stopped near an intersection.  Defendant got out of the car and ran into the neighborhood, and the car kept going.  Calmes's dash camera recorded the incident, and the video was played to the jury.

Deputies Calmes and Door chased the Lincoln.  Calmes broadcast on the radio that defendant had run into the neighborhood.  Three to five minutes into the chase, however, Calmes's vehicle began losing power.  Door continued the pursuit while Calmes stopped his car in front of the patrol station.  Inspecting the car, Calmes discovered two bullet holes in the windshield where he had shot out from inside the vehicle.  He also saw a bullet hole on the passenger side of the windshield and another bullet hole in the passenger mirror.  Fluid was leaking from the radiator.  There was a bullet hole just below the front license plate, which he believed was from the bullet that hit the car's radiator.  Another bullet hit the passenger side windshield wiper and ricocheted across the

4

windshield, leaving a mark.  Inside the car, Calmes found a bullet fragment on his driver's seat.  There was also a bullet hole on the passenger seat headrest.

Later that morning, an investigating officer found six .380-caliber shell casings and one bullet projectile in the southbound lane of Stockton Boulevard where the shooting had occurred.  Another investigating officer examined Deputy Calmes's patrol vehicle.  He found five bullet holes in the vehicle.  One hole was near the right front tire in the car's plastic molding; another hole was on the front of the vehicle at the radiator; two holes were on the passenger side of the windshield, one of which was near the windshield wiper; and the fifth hole was in the passenger side mirror.  Inside the vehicle, the officer found bullet fragments on the driver's front seat and the passenger side floorboard.  There were also two defects to the windshield that were caused by Deputy Calmes's return fire.

Officers searching the Lincoln sedan found, among other items, a box of .380-caliber ammunition that contained five unused cartridges.  Defendant's fingerprints were lifted from documents located in the Lincoln's trunk.

C.      Defendant's Apprehension

Around 6:00 a.m. that morning, June 8, defendant called Tim Bones and asked for a ride.  Bones later picked up defendant at a motel near Stockton Boulevard and Fruitridge Road.  Defendant looked nervous, and he asked Bones to take him to a car parked in a Walmart parking lot near Elverta Road and Watt Avenue.  While Bones was in the motel room, a news report came on the TV about a "cop" and that Fruitridge was shut down.  Defendant said, "I gotta go.  I did that."  When he got in the car, defendant was wearing a red wig.  Bones took defendant and dropped him off at a white Camaro that had paper plates.

That day, June 8, Sergeant Nathan Burnette of the Sacramento County Sheriff's Department was following up on leads to find defendant.  Around 8:35 p.m., Burnette

5

learned that defendant's Camaro had been spotted in the area of Florin Road and Franklin Boulevard. Burnette saw the car and began following it onto northbound Highway 99. The Camaro left the freeway at 12th Avenue and went eastbound. While on 7th Street, the Camaro abruptly stopped and then immediately accelerated. Burnette and other officers who had joined the chase activated their lights and sirens and pursued the car at over 50 miles per hour in the residential neighborhood.

The Camaro headed back toward Highway 99 by driving westbound on 12th Avenue. At that moment, Sergeant William Griggs and Deputy Joey Lemus were traveling eastbound on 12th Avenue in pursuit of defendant with their lights and siren on. When the Camaro was about 25 to 30 yards away from the officers' car, it swerved into the eastbound lane and drove directly at the officers. The Camaro did not take any evasive action to avoid a collision, forcing Griggs to drive up onto a sidewalk and the front lawn of a residence on the street's south side.

The Camaro got back onto northbound Highway 99. It was driven recklessly, swerving around traffic, driving on the shoulder, and almost causing several collisions. Sergeant Burnette, who was behind the Camaro, estimated the car was travelling in excess of 130 miles per hour at times. The Camaro weaved in and out of traffic, used all the lanes, and passed vehicles on the shoulder.

At one point, the Camaro left the freeway, then reentered the freeway behind Sergeant Burnette's car. When the car passed Burnette, he looked into the car and identified defendant as the driver. Defendant was wearing a "brownish, reddish wig" with a baseball cap.

Defendant attempted to exit at Arden Way, but the Camaro lost traction, slid through the gore point, crossed the Arden Way onramp to Interstate 80, and nosed into a ditch in front of a chain-link fence. Sergeant Burnette stopped his car on the freeway, grabbed his duty rifle, and got out. As he jumped down an embankment, he saw

6

defendant exit the Camaro and attempt to climb over the chain-link fence. Failing that, defendant ran down the center of the freeway onramp toward Arden Way.

A line of cars waiting to enter the onramp had stopped. Defendant ran toward them. He ran up to a truck and attempted to open the driver's side door but was unsuccessful. He ran to a Toyota sedan and attempted to open its driver's side door. A.C. was in her Toyota when defendant ran toward her. Defendant grabbed the car's door handle and yelled at A.C. to get out of the car. A.C. stayed in the car and was able to accelerate away from the scene. As she fled, she saw officers chasing defendant.

By then, Sergeant Burnette was about 15 yards from defendant. He brought up his rifle and yelled at defendant to get on the ground. Initially, defendant began running back toward the freeway, but then he put his hands up and proned himself on the ground. Burnette held him there at gunpoint until other officers arrived.

Officers searching the Camaro found that the license plates had been removed from the car and were in a seat back pocket. Officers also found a brown wig.

D.    Verdicts and Sentence

A jury found defendant guilty of one count of the attempted murder of Deputy Calmes, with special findings that defendant attempted to murder Calmes willfully and with premeditation and deliberation, he attempted to murder a peace officer, and he personally and intentionally used and discharged a firearm. (§§ 664/187, subd. (a); 12022.5; 12022.53, subds. (b), (c) (count one).)

The jury found defendant guilty of two counts of assault on a peace officer with a semiautomatic firearm (as to Officers Door and Seitz), the lesser included offenses of attempted murder. (§ 245, subd. (d)(2) (counts two and three).) It found true special findings that in each offense, defendant personally and intentionally used and discharged a firearm. (§§ 12022.5; 12022.53, subds. (b), (c).)

7

The jury also found defendant guilty of evading a police officer (count four), two counts of assault on a peace officer with a deadly weapon (as to Officers Lemus and Griggs, counts five and six), and one count of attempted carjacking (as to A.C., count seven). (Veh. Code, § 2800.2, subd. (a); Pen. Code, §§ 245, subd. (c); 664/215, subd. (a).)

The trial court sentenced defendant to an aggregate prison term of 2 years, 10 months plus 35 years to life, calculated as follows: 15 years to life on count one plus a consecutive 20 years for the firearm enhancement under section 12022.53, subdivision (c); a consecutive 8 months (one third the midterm) on count four; a consecutive 1 year 4 months (one third the midterm) on count five; and a consecutive 10 months (one-third the midterm) on count seven.[1] The trial court said the sentence was 37 years 10 months to life.

The court also imposed a concurrent term of 7 years each (the midterm) on counts two and three plus 20 years for each of the firearm enhancements on those counts under section 12022.53, subdivision (c); and a concurrent 4 years (the midterm) on count six.[2]

The trial court ran the sentence consecutive to a sentence defendant had received following a conviction of first degree murder in a Placer County matter. For that crime, defendant was sentenced to life without parole plus 25 years to life for a firearm enhancement.

---

[1] The abstract of judgment incorrectly states the sentence on count seven is to run concurrently. We will order the abstract be corrected.

[2] The abstract of judgment does not reflect the concurrent terms of 20 years for each of the firearm enhancements on counts two and three. We will order the abstract be corrected.

DISCUSSION

I

*Sufficiency of the Evidence of Premeditated Attempted Murder*

Defendant contends that insufficient evidence supports the jury's finding of willful, deliberate, and premeditated attempted murder. He argues the evidence at most supports a finding of implied malice, which cannot support the specific intent crime of attempted murder. He asks us to reverse his conviction or, alternatively, vacate the special finding and resentence him to a term in line with a plea bargain the prosecutor proposed before trial began. That proposed sentence for all of the charges was 20 years four months.

"To assess the evidence's sufficiency, we review the whole record to determine whether *any* rational trier of fact could have found the essential elements of the crime or special circumstances beyond a reasonable doubt. (*People v. Maury* (2003) 30 Cal.4th 342, 403 [] (*Maury*).) The record must disclose substantial evidence to support the verdict—i.e., evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. (*Id.* at p. 396.) In applying this test, we review the evidence in the light most favorable to the prosecution and presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence. ([*People v*.] *Boyer* [(2006)] 38 Cal.4th [412,] 480.) 'Conflicts and even testimony [that] is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends. [Citation.] We resolve neither credibility issues nor evidentiary conflicts; we look for substantial evidence. [Citation.]' (*Maury, supra*, at p. 403.) A reversal for insufficient evidence 'is unwarranted unless it appears

9

"that upon no hypothesis whatever is there sufficient substantial evidence to support" '
the jury's verdict. (*People v. Bolin* (1998) 18 Cal.4th 297, 331 [].)

"The same standard governs in cases where the prosecution relies primarily on circumstantial evidence. (*Maury, supra,* 30 Cal.4th at p. 396.) We 'must accept logical inferences that the jury might have drawn from the circumstantial evidence. [Citation.]' (*Ibid.*) 'Although it is the jury's duty to acquit a defendant if it finds the circumstantial evidence susceptible of two reasonable interpretations, one of which suggests guilt and the other innocence, it is the jury, not the appellate court that must be convinced of the defendant's guilt beyond a reasonable doubt. [Citation.]' (*People v. Kraft* (2000) 23 Cal.4th 978, 1053-1054 [].) Where the circumstances reasonably justify the trier of fact's findings, a reviewing court's conclusion the circumstances might also reasonably be reconciled with a contrary finding does not warrant the judgment's reversal. (*Ibid.*)" (*People v. Zamudio* (2008) 43 Cal.4th 327, 357-358.)

The crime of attempted murder "requires the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing. (*People v. Ervine* (2009) 47 Cal.4th 745, 785 [].) Attempted murder requires express malice, that is, the assailant either desires the victim's death, or knows to a substantial certainty that the victim's death will occur." (*People v. Booker* (2011) 51 Cal.4th 141, 177-178.)

Substantial evidence supports the jury's finding that defendant specifically intended to kill Deputy Calmes when he shot at him. After the police had followed the Lincoln with their lights on, defendant told Bergsten to pull over. Then he grabbed a loaded handgun from the door next to him, got out of the car, and immediately fired in Calmes's direction and at Calmes's vehicle while the deputy was still in the car, hitting the car at least five times. Two bullet fragments were found inside the car's passenger cabin, with one found on the driver's seat Calmes sat in during the shooting. This is sufficient circumstantial evidence of specific intent.

10

Defendant argues the evidence is insufficient to establish specific intent because there was no evidence Calmes was in the direct line of fire or that defendant was shooting at Calmes "personally." All the bullets hit only the car and the car's passenger side. Also, defendant argues that the ballistics expert testified the trajectory of the bullet passed from the driver's side to the passenger side and hit unoccupied portions of the car.

We disagree with defendant. "[T]he act of purposefully firing a lethal weapon at another human being at close range, without legal excuse, generally gives rise to an inference that the shooter acted with express malice. That the shooter had no particular motive for shooting the victim is not dispositive, although again, where motive is shown, such evidence will usually be probative of proof of intent to kill. Nor is the circumstance that the bullet misses its mark or fails to prove lethal dispositive—the very act of firing a weapon ' "in a manner that could have inflicted a mortal wound had the bullet been on target" ' is sufficient to support an inference of intent to kill. ([*People v.*] *Chinchilla* [(1997)] 52 Cal.App.4th [683,] 690.)" (*People v. Smith* (2005) 37 Cal.4th 733, 742.)

The jury could have concluded beyond a reasonable doubt that defendant's firing of a handgun at least five times from a close distance aimed at the patrol vehicle stopped behind defendant's car and which defendant knew was occupied demonstrated defendant specifically intended to kill Deputy Calmes.

Moreover, defendant misstates the ballistic expert's testimony regarding the bullets' trajectory. One bullet went through the patrol car's windshield and the passenger seat headrest. That bullet's trajectory moved left to right, "meaning that it was moving slightly from the passenger side towards the driver's side." Bullets that hit the passenger side mirror and the car's front grill roughly followed the same trajectory. Contrary to defendant's assertion, the bullets did not pass from the driver's side to the passenger side. Substantial evidence thus supports the jury's finding of specific intent.

Substantial evidence also supports the jury's findings that defendant's attempt to murder Deputy Calmes was premeditated and deliberate. In this context,

11

" ' "premeditated" means "considered beforehand," and "deliberate" means "formed or arrived at or determined upon as a result of careful thought and weighing of considerations for and against the proposed course of action." [Citation.]' (*People v. Mayfield* (1997) 14 Cal.4th 668, 767 [].) 'The process of premeditation and deliberation does not require any extended period of time. "The true test is not the duration of time as much as it is the extent of the reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly . . . ." [Citations.]' (*Ibid.*) 'In [*People v. Anderson* (1968) 70 Cal.2d 15 (*Anderson*)], [the California Supreme Court] "identified three categories of evidence relevant to resolving the issue of premeditation and deliberation: planning activity, motive, and manner of killing." [Citation.] However, these factors are not exclusive, nor are they invariably determinative. [Citation.] " '*Anderson* was simply intended to guide an appellate court's assessment whether the evidence supports an inference that the killing occurred as the result of preexisting reflection rather than unconsidered or rash impulse. [Citation.]' " [Citation.]' " (*People v. Lee* (2011) 51 Cal.4th 620, 636.)

Substantial evidence demonstrated that defendant considered and planned the attempted murder before he shot at Deputy Calmes. He was the passenger in the Lincoln when Calmes began following the car and when Calmes followed with his lights and siren on. There was no evidence defendant at this moment panicked or acted rashly. Rather, after Bergsten began slowing the car down, defendant directed Bergsten to pull the car over and stop. He took the loaded handgun from inside his door and, once the car stopped, he got out of the car and began shooting. Defendant had time to reflect upon the predicament he was in and decide how to respond. The jury could determine beyond a reasonable doubt that defendant quickly decided on a plan and executed the plan.

Substantial evidence also demonstrated that defendant's manner of attempting to kill Deputy Calmes "was so particular and exacting" that defendant must have intended to kill "according to a 'preconceived design' to take his victim's life in a particular way

12

for a 'reason' which the jury can reasonably infer" from facts of planning or motive. (*People v. Anderson*, *supra*, 70 Cal.2d at p. 27.)  Defendant executed his plan with exactness.  After telling Bergsten to pull the car over and stop, he grabbed the handgun, got out of the car, and immediately shot at Calmes a number of times.  He did not waver upon exiting the car.  Without hesitation, he quickly aimed at Calmes and fired at least five shots toward the deputy.  He got back into the car just as quickly and the car sped away until it stopped, and defendant ran into the neighborhood.  The jury could conclude beyond a reasonable doubt from the manner in which defendant attempted to kill Calmes that defendant must have intentionally acted according to a preconceived design not to be stopped by law enforcement at any cost.

Defendant argues that the speed with which his encounter with the officers escalated to a shooting belies any planning activity.  He contends the immediacy of his actions shows he could not have planned to shoot the officers.  But defendant's argument does not address the time he had to develop a plan beginning no later than when Deputy Calmes initiated the vehicle stop by turning on his lights and siren.  According to Calmes's vehicle dash camera, approximately 18 seconds transpired from when the Lincoln turned onto Stockton Boulevard and Calmes activated his lights and dash camera until defendant got out of the car and shot at Calmes.  Within those 18 seconds, defendant had sufficient time to reflect upon his predicament and develop a plan to thwart the vehicle stop and to get away.

Defendant contends the jury could have just as easily concluded he was only trying to get the officers to back off to have time to get away or to prevent Bergsten from being ticketed.  Our role on appeal, however, is not to speculate what the jury could have concluded.  Our role is only to determine whether substantial evidence supports the jury's verdict.  (*People v. Zamudio, supra*, 43 Cal.4th at pp. 357-358.)

Defendant argues there was little evidence he had a motive to kill the officers. Evidence about the Placer County case was not introduced at trial.  And the record does

13

not disclose whether defendant knew Bergsten did not have a driver's license. But the jury could reasonably infer defendant knew the registration on his Lincoln was expired. And in her hospital interview with detectives, Bergsten stated defendant fired the gun because he did not want to go to jail. Moreover, in applying the *Anderson* factors, we are not required to find evidence supporting each of the three factors. The factors are merely a framework for appellate courts to use to assess whether the evidence supports an inference that the attempted murder " 'was the result of preexisting reflection and weighing of considerations rather than mere unconsidered or rash impulse.' " (*People v. Booker, supra*, 51 Cal.4th at p. 173.) The factors do not need to be present in some special combination or afforded special weight, nor are they exhaustive. (*Ibid*.) Any lack of evidence of motive in this circumstance does not void the jury's finding of premeditation and deliberation and that defendant did not act solely out of rash impulse.

Defendant argues the manner of the shooting does not indicate that he determined to kill Deputy Calmes, as he shot from 25 feet away and the bullets hit the unoccupied side of the patrol car. The distance and defendant's poor shooting does not disprove that defendant deliberately attempted to kill Calmes. A distance of 60 feet between the shooter and the victim has been held to be "at close range" for purposes of finding specific intent for attempted murder. (*People v. Perez* (2010) 50 Cal.4th 222, 231-233.) The jury could conclude beyond a reasonable doubt that defendant carried forward a preconceived plan to kill Calmes in order to thwart the vehicle stop. Two bullet fragments were found inside the patrol car, one on Calmes's seat. And defendant's plan succeeded, at least for a time. He was able to thwart the vehicle stop and enable himself and Bergsten to get away.

We thus conclude substantial evidence supports the jury's determination that defendant attempted to kill Deputy Calmes and that the attempt was willful, deliberate, and premeditated beyond a reasonable doubt.

14

## II

### *Firearm Enhancements*

Defendant contends we should remand this case for the trial court to reconsider its imposition of a 20-year firearm enhancement under section 12022.53, subdivision (c) to the attempted murder conviction because the record contains no indication the court recognized its discretion to strike the enhancement or impose a lesser firearm enhancement. Alternatively, defendant contends counsel rendered ineffective assistance by not specifically requesting the court exercise its discretion.

A.      Background

Section 12022.53 prescribes enhancements for the use of firearms in certain serious felonies, including attempted murder, and vests the trial court with discretion in imposing the penalty. Under subdivision (b) of section 12022.53, the penalty for using a firearm to commit the felony is an additional and consecutive 10-year prison term. Under subdivision (c) of the statute, the penalty for personally and intentionally discharging a firearm to commit the felony is an additional 20-year term.

If the jury or court finds that more than one of these enhancements is true, the court must impose the enhancement that provides the longest term of imprisonment. (§ 12022.53, subd. (f).) In the interest of justice, however, the trial court may strike or dismiss an enhancement otherwise required by section 12022.53. (§ 12022.53, subd. (h).)

On counts one through three, defendant's convictions of attempted murder and two counts of assault on a peace officer with a firearm, the jury found true the firearm enhancements under both subdivisions (b) and (c) of section 12022.53. In defendant's probation report, the probation officer noted the jury had found both enhancements to be true. The officer stated that subdivision (f) of section 12022.53 required the court to impose the enhancement that would result in the longest prison sentence. As a result, the report recommended that the court impose the 20-year enhancement under subdivision

15

(c). The report did not discuss the court's discretion to strike or dismiss the enhancements under subdivision (h).

At sentencing, defense counsel asked the court to impose the low term where applicable and give as lenient a sentence as possible because defendant was already serving a term of life without parole plus 25 years in the Placer County matter. The court could also impose concurrent sentences. Counsel did not specifically ask the court to strike or dismiss the enhancement under section 12022.53. The court imposed the 20-year enhancement under subdivision (c) on each of the three counts. It further stated, "And under the law, I'm not imposing the additional firearm enhancements that were found true."

B.    Analysis

Defendant's argument is forfeited. Defense counsel did not make a specific request to strike or dismiss the enhancement on the attempted murder count. Defendant asserts, without citing authority, that counsel's request to impose as lenient a sentence as possible was sufficient to preserve this issue for review. It was not. A specific objection is required to preserve arguments for appeal. (See *People v. Partida* (2005) 37 Cal.4th 428, 434.) The argument is thus forfeited. (*People v. Scott* (1994) 9 Cal.4th 331, 356.)

Defendant contends his trial counsel rendered ineffective assistance by not requesting the court to strike or impose a lesser enhancement. "In order to establish a claim of ineffective assistance of counsel, defendant bears the burden of demonstrating, first, that counsel's performance was deficient because it 'fell below an objective standard of reasonableness [¶] . . . under prevailing professional norms.' (*Strickland v. Washington* [(1984)] 466 U.S. 668, 688 [];[citation].) Unless a defendant establishes the contrary, we shall presume that 'counsel's performance fell within the wide range of professional competence and that counsel's actions and inactions can be explained as a matter of sound trial strategy.' (*People v. Carter* (2003) 30 Cal.4th 1166, 1211 [].) If the

16

record 'sheds no light on why counsel acted or failed to act in the manner challenged,' an appellate claim of ineffective assistance of counsel must be rejected 'unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation.' (*People v. Pope* (1979) 23 Cal.3d 412, 426 []; [citation].)  If a defendant meets the burden of establishing that counsel's performance was deficient, he or she also must show that counsel's deficiencies resulted in prejudice, that is, a 'reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' (*Strickland, supra*, 466 U.S. at p. 694.)" (*People v. Ledesma* (2006) 39 Cal.4th 641, 745-746.)

Defendant argues that counsel's performance was deficient.  He claims that after the enactment of Senate Bill No. 620 in 2018 which vested the trial court with discretion to strike or dismiss the enhancement, reasonable counsel would have requested the court to strike the enhancement or impose a lesser enhancement.  Counsel also should have alerted the court to the probation report's omission of the court's discretion under section 12022.53, subdivision (h) and the omissions' inference that the court had no discretion to impose anything but the penalty resulting in the longest prison term under subdivision (f).  Defendant also claims that nothing in the record shows the trial court would have refused to consider imposing a lesser penalty under the circumstances.

Missing from defendant's opening brief is any argument that counsel's omission of a request to lessen or strike the enhancement was prejudicial, i.e., that but for counsel's errors, there is a reasonable probability the court would have lessened or stricken the 20-year enhancement.  Defendant argues that nothing in the record shows that the trial court would have refused to consider imposing a lesser penalty.  Defendant's argument, however, is not the standard of prejudice we apply.

Defendant bore the burden of proving by a preponderance of the evidence that if the trial court knew about its discretion, it would have exercised it by lessening or striking the enhancement.  Merely arguing the trial court would have *considered*

17

exercising its discretion does not establish a reasonable probability that defendant would have obtained a more favorable result but for counsel's omission.

And even if the trial court had considered exercising its discretion, it is not reasonably probable it would have lessened or stricken the enhancement on the ground that defendant was already serving a sentence of life without parole plus 25 years. Defendant attempted to kill Deputy Calmes by shooting at him and his marked vehicle at least five times and while another occupied patrol car was immediately behind Calmes. Defendant engaged in further criminal acts to avoid being apprehended that put others in harm's way. He drove his vehicle at a high rate of speed in the opposite lane of traffic directly aiming for a marked law enforcement vehicle that had its lights and siren on. He drove recklessly on the freeway at speeds approximating 130 miles per hour to evade capture, endangering numerous drivers and narrowly avoiding serious accidents. He also attempted to carjack an innocent bystander's car. He committed all of these crimes in less than 24 hours. It is not reasonably probable under these circumstances that the trial court would have lessened or stricken the enhancement under section 12022.53, subdivision (c) had counsel so requested. Defendant has thus not established that his trial counsel rendered ineffective assistance.

III

*Ability to Pay Fines and Fees*

At sentencing, defense counsel asked the trial court to waive all nonmandatory fines and fees because defendant would be indigent due to his sentence of life without parole plus 25 years. The court, however, imposed a $5,000 restitution fine under section 1202.4 and stayed a parole revocation fine under section 1202.45 in the same amount. The court also ordered defendant to pay a court operations assessment of $280 under section 1465.8 and a court facility fee of $210 under Government Code section 70373. The court did not directly address defendant's request.

18

Defendant contends that the trial court's not determining his ability to pay the fines and fees violated his constitutional rights to due process as set forth in *People v. Dueñas* (2019) 30 Cal.App.5th 1175, 1164, and the constitutional prohibition against excessive fines as set forth in *People v. Aviles* (2019) 39 Cal.App.5th 1055, 1069-1072 (*Aviles*). He asks us to remand for a hearing on his ability to pay the fines and fees.

Defendant contends *Dueñas* required the court to hold a hearing to determine his ability to pay, and that not doing so violated his due process and equal protection rights. As defendant notes, the Courts of Appeal are split as to whether *Dueñas* was correctly decided. Our Supreme Court must resolve this question, having granted review in *People v. Kopp* (2019) 38 Cal.App.5th 47, 95-96, review granted November 13, 2019, S257844, which concluded due process requires the trial court to conduct an ability-to-pay hearing before imposing assessments but not restitution fines.

In the meantime, we join the court in *People v. Hicks* (2019) 40 Cal.App.5th 320, 327-329, review granted November 26, 2019, S258946, and several other courts in concluding that the principles of due process do not require a determination of a defendant's present ability to pay before imposing fines and assessments at issue in *Dueñas* and in this proceeding. (*People v. Cota* (2020) 45 Cal.App.5th 786, 794-795; *People v. Kingston* (2019) 41 Cal.App.5th 272, 279; *Aviles, supra*, 39 Cal.App.5th at pp. 1068-1069; *People v. Caceres* (2019) 39 Cal.App.5th 917, 928.)

In a related argument, defendant contends that imposing the fines without considering his ability to pay violated the excessive fines clauses of the federal and state Constitutions (U.S. Const., Amend. VIII; Cal Const., art. I, § 17). " 'The Eighth Amendment prohibits the imposition of excessive fines. The word "fine," as used in that provision, has been interpreted to be " 'a payment to a sovereign as punishment for some offense.' " [Citation.]' (*[People v.] Gutierrez* [(2019)] 35 Cal.App.5th [1027,] 1040 (conc. opn. of Benke, J.) [(*Gutierrez*)].) The determination of whether a fine is excessive for purposes of the Eighth Amendment is based on the factors set forth in [*United States*

19

*v.*] *Bajakajian* [(1998)] 524 U.S. 321 [] [(*Bajakajian*)].  (*People ex rel. Lockyer v. R.J. Reynolds Tobacco Co.* (2005) 37 Cal.4th 707, 728 [].)

" 'The touchstone of the constitutional inquiry under the Excessive Fines Clause is the principle of proportionality:  The amount of the forfeiture must bear some relationship to the gravity of the offense that it is designed to punish.  [Citations.] . . .  [A] punitive forfeiture violates the Excessive Fines Clause if it is grossly disproportional to the gravity of a defendant's offense.'  (*Bajakajian, supra*, 524 U.S. at p. 334.)

"The California Supreme Court has summarized the factors in *Bajakajian* to determine if a fine is excessive in violation of the Eighth Amendment:  '(1) the defendant's culpability; (2) the relationship between the harm and the penalty; (3) the penalties imposed in similar statutes; and (4) the defendant's ability to pay.  [Citations.]' (*People ex rel. Lockyer v. R.J. Reynolds Tobacco Co., supra*, 37 Cal.4th at p. 728; see *Gutierrez, supra*, 35 Cal.App.5th at p. 1040 (conc. opn. of Benke, J.).)  While ability to pay may be part of the proportionality analysis, it is not the only factor.  (*Bajakajian, supra*, 524 U.S. at pp. 337–338.)"  (*Aviles, supra*, 39 Cal.App.5th at p. 1070.)  We review the excessiveness of a fine challenged under the Eighth Amendment de novo.  (*Id.* at p. 1072.)

Here, we find that the restitution fines and other assessments are not grossly disproportionate to the level of harm and defendant's culpability.  Defendant was convicted of seven counts, including the first degree attempted murder of a peace officer and several counts of assaults on other peace officers with a firearm and a vehicle.  His sentence included a term of 15 years to life plus 20 years for a firearm enhancement. There is also no evidence that defendant will not have the ability to earn prison wages that may be applied toward the fines and fees.  In these circumstances, the restitution fines were minor compared to defendant's sentence and the gravity of his offenses and thus were not constitutionally disproportionate.

## DISPOSITION

The judgment is affirmed. The clerk of the trial court is ordered to correct the abstract of judgment (1) to reflect the concurrent terms of 20 years for each of the firearm enhancements on counts two and three under section 12022.53, subdivision (c), and (2) to indicate the 10-month term on count seven was imposed consecutively, and then to file the corrected abstract of judgment with the Department of Corrections and Rehabilitation.

                                                 _____

                                                 HULL, J.

I concur:

_____

EARL, P. J.

21

ROBIE, J., Concurring.

I concur fully in all parts of the majority's opinion, except Part III of the Discussion. As to Part III of the Discussion, I concur in the result but disagree with the conclusion that *People v. Dueñas* (2019) 30 Cal.App.5th 1157 was wrongly decided. (Maj. opn. *ante*, at pp. 20-21.) I believe *Dueñas* is good law, but defendant failed to prove any error on appeal.

Defendant Jimmy Young Vang believes the trial court violated his due process and Eighth Amendment rights by imposing a $5,000 restitution fine, $280 court operations assessment, and $210 court facilities fee because his counsel requested that the trial court "waive the fines and fees that the Court is allowed to do" given defendant "will be indigent" due to the length of the sentence imposed. Defendant complains the trial court "never acknowledged [his] request and did not give reasons for finding that he would have the ability to pay the amounts ordered."

Defendant cites no authority, nor does he provide any cogent argument supported by reasoned analysis that the trial court had to state reasons for finding he had the ability to pay. (See *People v. Avila* (2009) 46 Cal.4th 680, 729 [express findings by the court as to ability to pay are not required].) A defendant has the burden of proving his or her inability to pay fines, fees, and assessments at the hearing imposing such fines, fees, and assessments in the trial court. (*People v. Castellano* (2019) 33 Cal.App.5th 485, 490.) Defendant acknowledges he merely relied on the length of his sentence as the grounds for asserting he "will be" indigent. Defendant, however, introduced and pointed to no evidence and provided no argument that he did not have the *present* (in comparison to future) ability to pay the fine, fee, and assessment. An attorney's argument is not evidence. (Evid. Code, § 140; *People v. Kiney* (2007) 151 Cal.App.4th 807, 815; *Van De Kamp v. Bank of America* (1988) 204 Cal.App.3d 819, 843.) Defendant thus failed to carry his burden in proving his inability to pay in the trial court and has failed to

1

demonstrate error on appeal.  I accordingly agree with the majority that the judgment should be affirmed.

_____
ROBIE, J.

2